**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**Case No.: 9:23cv80209**

PALM GARDEN OF WEST PALM
BEACH, LLC,

      Petitioner,

                                  FMCS Case No. 221216-01963

v.                                     (Terri Haliburton)

1199 SEIU, UNITED HEALTHCARE
WORKERS EAST,

      Respondent.
_____/

## <u>MOTION TO VACATE ARBITRATION AWARD</u>

Petitioner, Palm Garden of West Palm Beach, LLC, pursuant to 9 U.S.C. § 10 of the Federal Arbitration Act (FAA), by and through its undersigned counsel, hereby moves this Court to Vacate an Arbitration Opinion and Award entered on January 27, 2023, and as grounds therefor, alleges as follows:

### <u>JURISDICTION AND VENUE:</u>

Jurisdiction of this Court is invoked pursuant to 9 U.S.C. § 10 which states:

In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
(1) where the award was procured by corruption, fraud, or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  Applications to vacate an arbitration award under FAA Section 10 are to be made as motions.  *See Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) (FAA applications for vacatur are motions).  Pursuant to FAA Section 10, "courts may vacate an arbitration award upon 'application' of any party to the arbitration; does not instruct parties to file a complaint; and does not instruct the district court to carry on a formal judicial proceeding."  *PG Publ'g, Inc. v. The Newspaper Guild of Pittsburgh*, 19 F.4th 308, 313 (3d Cir. 2021).

The summary proceedings that result from an FAA motion to confirm or vacate an arbitration award are "not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm."  *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 252 (3d Cir. 2020); *see also O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc.*, 857 F.2d 742, 745 (11th Cir. 1988) (rejecting contention that an FAA proceeding to vacate an arbitration award should "develop into full scale litigation, with the attendant discovery, motions, and perhaps trial").  A court can, within its

discretion, decide an FAA motion without conducting a full hearing or taking additional evidence. *Legion Ins. Co. v. Ins. Gen. Agency, Inc.*, 822 F.2d 541, 542–43 (5th Cir. 1987) ("This case posed no factual issues that required the court, pursuant to the Arbitration Act, to delve beyond the documentary record of the arbitration and the award rendered.").

Venue lies within the United States District Court for the Southern District of Florida, West Palm Beach Division because a substantial part of the events giving rise to this claim occurred in this Judicial District and is therefore proper pursuant to 28 U.S.C. §1391(b).

## FACTUAL BACKGROUND

Terri Haliburton (GRIEVANT) was an employee of Palm Garden of West Palm Beach (EMPLOYER) working as a Certified Nursing Assistant (CNA) and a member of 1199SEIU United Healthcare Workers East (UNION) who was terminated on September 13, 2021.  According to the Corrective Action, the justification for the termination was as follows:

> On Tuesday, 9/7/21 it was reported that you called a fellow team member an "Uncle Tom" when they passed you in the hallway.  It was also reported that you have been heard referring to the Executive Director as a "Cracker".
>
> It was also reported by fellow team members that you have exhibited behaviors that are discriminatory, derogatory, intimidating, considered bullying and harassment.  Terri this behavior is not

appropriate and creates a hostile working environment and does not promote the Palm Garden Mission, Vision, Values.  This behavior is also in direct violation of Palm Garden's Standards of Conduct Guidelines (refer to Pages 35 - 39 of the Employee Handbook), Minor Violation #13- Failure to treat all residents, visitors, families and fellow employees with kindness, respect and dignity and Major Violation #22. Being grossly disrespectful and/or insubordinate to supervisor and Major Violation #17.   Acts of prejudice or discrimination, physical contact/harassment of other team members, residents, or visitors.

This not only affects your ability to work together with your peers and team; but also affects our residents/patients.

A copy of the Team Member Handbook (HANDBOOK) referred to in the aforementioned Corrective Action is attached hereto as **EXHIBIT A**.  Immediately following the termination, the UNION filed a grievance pursuant to Article 15 of the Collective Bargaining Agreement (CBA).  A copy of the CBA is attached hereto as **EXHIBIT B**.  After exhausting the grievance process, the UNION submitted the matter for Arbitration through the Federal Mediation and Conciliation Services (FMCS) pursuant to Article 15, Section 4 of the CBA.  *See* **EXHIBIT B**, Page 12. This same section describes the role of the arbitrator under Article 15, Section 4(2) which states:

> The arbitrator shall have no power to alter, amend, change, add to or subtract from any of the terms of this Agreement, but **shall determine only whether or not there has been a violation of this Agreement within the allegations set forth in the grievance. The decision of the arbitrator shall be based solely on the restrictions on management rights outlined in this Agreement**, the evidence and arguments presented to him by the respective parties at such arbitration meeting but it may not result in what is, in effect, a modification (whether by

> addition or detraction) of the written terms of this Agreement and must draw its essence from the express provisions of this Agreement.

*See* **EXHIBIT B**, Page 12 (emphasis added).   The Management Rights to which the

above section references is found in Article 4 of the CBA which states:

> All rights which ordinarily vest in and are exercised by employers, and all of the rights, powers and authority possessed by the Facility prior to entering into this collective bargaining agreement, except as expressly and specifically abridged, delegated, granted or modified by this Agreement, shall continue to vest in the Facility. These rights shall include by way of enumeration and illustration below, but shall not be construed to be limited to the right to hire, promote, demote, layoff, assign. transfer, determine if a vacancy exists, set-up and determine the shift hours, determine the number of hours in a shift, suspend, discharge or **discipline employees for cause**.

See **EXHIBIT B**, Page 4-5 (emphasis added).   Among those Management Rights

listed include the right:

> To establish, change and enforce work rules and regulations governing conduct, obligations and acts of employees. The Employer will have the right to provide employees with an employee handbook, of which a copy will be provided to the union, and its' terms will be followed by employees so long as they do not conflict with the terms and conditions of the Agreement herein.

*See* **EXHIBIT B**, Page 5.  Finally, Management Rights also include the ability to "To

set standards of performance for employees, evaluate employees and enforce

those standards with discipline, **including discharge**."  *See* **EXHIBIT B**, Page 6

(emphasis added).

An Arbitration hearing took place over the course of two days on April 25

and June 3, 2022.  Eventually, on January 29, 2023, the arbitrator issued an Opinion

and Award (ORDER), a copy of which is attached hereto as **EXHIBIT C**.  The

arbitrator ordered that GRIEVANT "shall be reinstated within a reasonable period

of time.  The time between the date of termination and date of reinstatement shall

be a suspension without pay and benefits and this Award may be placed in Ms.

GRIEVANT's personnel file to serve as notice of this disciplinary action."  See

**EXHIBIT C**, page 38.

Following notice to the parties of the ORDER, this motion herein ensured.

<u>**MEMORANDUM OF LAW**</u>

**I.**      <u>**ARBITRATOR EXCEEDED HIS AUTHORITY:**</u>

The nature if this motion is to vacate an Arbitration Opinion and Award in

which the arbitrator ruled on matters that were outside his authority.   "[A]n

arbitrator is confined to interpretation and application of the collective bargaining

agreement; he does not sit to dispense his own brand of industrial justice."  *United*

*Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 1361,

4 L. Ed. 2d 1424 (1960) ("When the arbitrator's words manifest an infidelity to this

obligation, courts have no choice but to refuse enforcement of the award"); *see also*

*Warrior v. Gulf Nav. Co. v. United Steelworkers of Am., AFL–CIO–CLC*, 996 F.2d 279,

280–81 (11th Cir. 1993) (upholding district court's reversal of arbitration award by

finding that language in a CBA that an employee who tests positive a second time

is "subject to immediate discharge" gives management the complete discretion to

fire an employee); *Bruno's, Inc. v. United Food and Com. Wkrs. Int'l.*, 858 F.2d 1529, 1531 (11th Cir. 1988) (an arbitrator does not have unfettered discretion and may not "impose a remedy which directly contradicts the express language of the collective bargaining agreement.").

It is upon this basis that courts must vacate an arbitral award.  More specifically, an arbitrator's decision cannot stand if found to be irrational, if it exceeds the scope of his authority, or "fails to draw its essence from the collective bargaining agreement." *Butterkrust Bakeries v. Bakery Workers Int'l Union Local 361*, 726 F.2d 698, 699 (11th Cir. 1984).  In *Butterkrust*, the CBA gave the company "sole control over employee discipline ... subject only to the condition that termination be for just cause."  *Butterkrust*, 726 F.2d at 699.  The court concluded that the arbitrator exceeded his authority where "[t]he issue submitted here was limited to whether there was just cause for [the employee's] discharge.  Therefore, once the arbitrator made a finding on this issue, his authority came to an end." *Id.* at 700.

Plainly stated, an arbitrator may not "issue an award that contradicts the express language of the agreement." *IMC-Agrico Co. v. Int'l Chem. Workers Council of United Food & Com. Workers Union, AFL-CIO*, 171 F.3d 1322, 1325 (11th Cir. 1999); *see also Bruno's, Inc. v. United Food & Commercial Workers Int'l Union, Local 1657*, 858 F.2d 1529, 1531 (11th Cir. 1988); *Houston Lighting & Power Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 66*, 71 F.3d 179, 184 (5th Cir. 1995) ("If the language of the

agreement is clear and unequivocal, an arbitrator is not free to change its meaning."); *Sears, Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155 (6th Cir. 1982) ("[A]n arbitrator may construe ambiguous contract language, but lacks authority to disregard or modify plain or unambiguous contract provisions."); *Wiregrass Metal Trades Council AFL-CIO v. Shaw Env't & Infrastructure, Inc.*, 837 F.3d 1083, 1086 (11th Cir. 2016) (arbitrator "exceeds her authority when she modifies the contract's clear and unambiguous terms.").

A series of other cases stand for the proposition that, once an arbitrator finds that an employee has engaged in prohibited conduct, it is an implicit finding of just cause for termination and any subsequent decision to modify the type of discipline imposed is an act beyond the scope of the arbitrator's power. *See Warrior & Gulf Navigation Co. v. United Steelworkers of America*, 996 F.2d 279 (11th Cir. 1993); *E.I. DuPont de Nemours & Co. v. Local 900 of the Int'l Chem. Workers Union*, 968 F.2d 456, 458 (5th Cir. 1992); *Delta Queen Steamboat Co. v. District 2 Marine Engineers Beneficial Ass'n, AFLCIO*, 889 F.2d 599 (5th Cir. 1989); *Morgan Service v. Local 323, Chicago & Central States*, 724 F.2d 1217, 1221 (6th Cir. 1984).

In *Delta Queen Steamboat Co.*, the CBA had a similar provision of providing examples of "just cause" for termination to include, but not limited to "such as, but not limited to, inefficiency, insubordination, carelessness, or disregard of the rules of the Company" but did not require termination in all instances in which

those examples were found.  *Id*. at 601.  However, the arbitrator "felt that it would be unfair, in light of [the employee's] forty years of untarnished maritime service, for the company to impose the draconian measure of termination." *Id*.  The CBA in that matter stated that "The right to discipline and discharge for proper cause are [sic] likewise the sole responsibility of the Company." *Id*.  The 5th Circuit held that an arbitrator's "jurisdiction nevertheless is shaped by the underlying collective bargaining agreement." *Id*.  The Court acknowledged that the "arbitrator's decision is accorded considerable judicial deference", however, the Court further pointed out that where "the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end." *Id*. at 602.  In holding that "arbitral action contrary to express contractual provisions will not be respected", the Court ruled that the termination should be affirmed as the language in the CBA "proscribed the arbitrator from reinstating the discharged employee". *Id*. at 604.  In so finding, the Court stated:

> We understand the plain language of article VI of the agreement to confer upon the arbitrator the authority to determine whether there is "proper cause" for discipline because of employee carelessness. If proper cause exists, article V shifts sole responsibility for disciplinary action to management … To hold otherwise would allow arbitrators to shape employee discipline, in agreements where discipline is reserved to management.

*Id*. at 604.  Because the arbitrator found that the employee committed the "just cause" offense for which the employee was alleged to have been accused, the arbitrator was not free to fashion his own penalty.  *Id*.

The facts in the matter of *Morgan Service* are also similar in which an arbitrator fashioned his own brand of "industrial justice" by reinstating an employee terminated for insubordination.   The CBA in *Morgan Servs., Inc.* contained a general "Management Rights" clause which provided that "[e]xcept as specifically provided to the contrary in this Agreement," The employer in *Morgan Servs., Inc.* was "vested exclusively" with the power to "discharge employees for cause."  *Morgan Servs., Inc.*, 724 F.2d at 1219.  Similar to the instant matter, the arbitrator interpreted this language in the CBA to permit "him to modify the Company's sanction."  *Id*.  Also similar to the case at hand is that the CBA instructed that an "employee **may** be discharged without redress if proven guilty."  *Id*. at 1220 (emphasis added).  Although the arbitrator determined that this language was sufficient for him to find that discharge was "too severe a penalty," the court disagreed and held that the arbitrator "exceeded his contractual powers in modifying the sanction imposed by the Company" by finding the decision "fundamentally at odds with the collective bargaining agreement because arbitrators do not have the 'authority to disregard or modify plain and unambiguous provisions' of the agreement.  *Id*.

In the case at hand, the CBA specifies that the right to "set standards of performance for employees, evaluate employees and enforce those standards with discipline, **including discharge**" vests with Management.  *See* **EXHIBIT B**, Page 6 (emphasis added).  This theme is reiterated in that same section of the CBA which gives Management the sole right:

> To establish, change and enforce work rules and regulations governing conduct, obligations and acts of employees. **The Employer will have the right to provide employees with an <u>employee handbook</u>, of which a copy will be provided to the union, and its' terms will be followed by employees so long as they do not conflict with the terms and conditions of the Agreement herein**.

*See* **EXHIBIT B**, Page 5.  Finally, Management Rights also include the ability to "To set standards of performance for employees, evaluate employees and **<u>enforce those standards</u> with discipline, including discharge**."  *See* **EXHIBIT B**, Page 6 (emphasis added).

Consequently, the CBA clearly vests the EMPLOYER with the authority to "set standards of performance for employees, evaluate employees and enforce those standards with discipline, including discharge," to "enforce work rules and regulations governing conduct, obligations and acts of employees" and the right to provide employees with an employee handbook" containing those rules.  The HANDBOOK contains the infractions that constitute "just cause" and allow for immediate termination of employment.  Specifically, "just cause" is reflected in the HANDBOOK in the section of "Standards of Conduct" which outlines specific

instances of "just cause" as were cited in all three Corrective Actions that took place within a three-month period.  *See* **EXHIBIT A**, Pages 34-39.

This section of the HANDBOOK provides for two groups of infractions. Specifically, "Minor Violations" consist of "minor infractions, which after accumulative and/or repeated violations within a twelve (12) month period could result in termination" while "Major Violations" are those of sufficient severity that "could result in immediate termination from employment."  *See* **EXHIBIT A**, Pages 35-38.

Additionally, limitations of the arbitrator's authority are found in Article 15, Section 4(2) of the CBA which states:

> The arbitrator shall have no power to alter, amend, change, add to or subtract from any of the terms of this Agreement, but **shall determine only whether or not there has been a violation of this Agreement** within the allegations set forth in the grievance.

*See* **EXHIBIT B**, Page 12.  Consequently, it is not the job or the Arbitrator to determine if the punishment of termination was too harsh.  Rather, the role of the Arbitrator is to determine if the alleged conduct took place, and if the conduct was consistent with the Major Violations cited.  The arbitrator in this matter specifically found violations of the Agreement when he wrote in the ORDER that GRIEVANT's "conduct rose to a sufficient level of severity to support the issuance of a substantial disciplinary penalty."  However, the arbitrator went on further to exceed his authority by issuing his own brand of industrial justice when he

determined that "several facts and surrounding circumstances mitigate against the penalty of discharge." *See* **EXHIBIT C**, Page 37.

## II.   THE AWARD IS CONTRARY TO PUBLIC POLICY:

Courts may not enforce a provision of a CBA "that is contrary to public policy" and "may only vacate arbitration awards which explicitly conflict with well-defined, dominant public policy." *Stroehmann Bakeries, Inc. v. Loc. 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1441 (3d Cir. 1992). In *Stroehmann Bakeries, Inc.*, the arbitrator ordered an employee be reinstated who had been terminated for sexual harassment. *Id.* at 1438. However, on public policy grounds, the court found the arbitrator exceeded his authority by noting that:

> There is a well-defined and dominant public policy concerning sexual harassment in the workplace which can be ascertained by reference to law and legal precedent. Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a)(1) (West 1981), prohibits employment discrimination on the basis of sex. The Supreme Court of the United States has interpreted this prohibition to include sexual harassment in the workplace which has either an economic effect on the complainant, or creates a hostile or offensive work environment ...
>
> In addition to the public policy against sexual harassment in the workplace, a well-defined, dominant public policy favoring voluntary employer prevention and application of sanctions against sexual harassment in the workplace exists.

*Id.* at 1441. The court pointed out that EEOC guidelines provide that "employers should create a procedure to encourage alleged sexual harassment victims to come forward and seek to resolve their complaints." *Id.* at 1442. This same logic is relied

upon in the matter of *Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFL-CIO.*, 915 F.2d 840, 843 (2d Cir. 1990) in which the arbitrator reinstated an employee after finding that he had committed sexual harassment.  However, the court overturned the award "as violative of public policy … because it returned a known sexual harasser to the workplace, so perpetuating a hostile and offensive work environment and inhibiting the employer from performing its duty to prevent sexual harassment."  *See Newsday, Inc.*, 915 F.2d at 843–45.

If the arbitrator interprets the CBA in a manner that has the result of violating an explicit public policy, the courts "are obliged to refrain from enforcing it."  *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177 (1983); *see also Exxon Shipping Co. v. Exxon Seamen's Union*, 11 F.3d 1189, 1194 (3d Cir. 1993) ("we agree with the district court that the award in question in this case violates a public policy that is both well defined and dominant.")

Just as there is public policy to discourage sexual harassment in the workplace and for employers to have the ability to prevent the perpetuation of a hostile and offensive work environment, there is also public policy that employers be permitted to prevent hostile work environments caused by racism.

In the same law which creates the public policy against sexual harassment, Title VII of the Civil Rights Act of 1964 also makes it unlawful for employees in

the workplace to be subjected to a hostile work environment based on race.  Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

In the instant matter, the arbitrator recognized the "The Employer's interest in maintaining a respectful and non-discriminatory environment for its employees, residents, and visitors is self-evident."  *See* **EXHIBIT C**, page 38.  The arbitrator found further that "The Grievant's conduct by using a racial epithet with respect to a coworker is consistent with the intent and letter of conduct prohibited by the Employer's policy and has been proven to violate the policy establishing a non-discriminatory workplace."  *See* **EXHIBIT C**, Page 38.  In fact, the arbitrator went so far as to find that "the Grievant's conduct rose to a sufficient level of severity to support the issuance of a substantial disciplinary penalty."  *See* **EXHIBIT C**, Page 38.  However, the arbitrator went on to "dispense his own brand of industrial justice" and felt free to was not free to "fashion his own penalty" by ordering GRIEVANT be reinstated in complete abrogation of the public policy to prevent racism in the workplace and allow employers to create a safe environment for its employees that is free of intimidation and harassment.  *See* **EXHIBIT C**, Page 38.

Furthermore, the CBA has a specific nondiscrimination policy as outlined in Article 13.  *See* **EXHIBIT B**, Page 10.  A more detailed policy against discrimination and harassment is found in the Team Member Handbook in several places to

include the section on "Equal Opportunity" which states "[u]nlawful discrimination and harassment will not be tolerated. Any Team Member in violation of this equal opportunity policy will be subject to disciplinary action, up to and including termination."  *See* **EXHIBIT A**, Page 67.  This policy is also contained in the section of Harassment and Discrimination which states:

> To help ensure that no Team Member feels themselves to be subject to discrimination or unlawful harassment, the Center prohibits any offensive physical, written, or spoken conduct regarding any protected trait, including conduct of a sexual nature, off-color jokes, racial, ethnic, or religious slurs or innuendos.

*See* **EXHIBIT A**, Page 48.  Of course, this is the exact type of behavior prohibited and constitutes a Major Violation No. 17 that states that "Acts of prejudice or discrimination, physical contact / harassment of other Team Members, residents or visitors" to which the arbitrator found that GRIEVANT violated and "could result in immediate termination from employment."  *See* **EXHIBIT A**, Page 42.

## III.   THE JUSTIFICATIONS USED FOR AWARDING REINSTATEMENT ARE INTERNALLY INCONSISTENT AND REVEAL UNION BIAS:

As previously cited, pursuant to 9 U.S.C. § 10 which states:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to

hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Here, in addition to ruling against public policy concerning racism and exceeding his powers as an arbitrator, the arbitrator also "so imperfectly executed" his powers as to justify that his ORDER be vacated as well.

In reaching his conclusion to reinstate the GRIEVANT, the arbitrator stated:

Considering the totality of the record, I find that the Grievant's conduct rose to a sufficient level of severity to support the issuance of a substantial disciplinary penalty but also that several facts and surrounding circumstances mitigate against the penalty of discharge. The seriousness of the misconduct proven must be weighed against the Grievant's admirable lengthy service to the Employer and any other mitigating factors. The record reflects that no interim penalty above, First Reminders or written reprimands, had been issued prior to September 13, 2021. This was despite allegations that the Grievant had engaged in substantially similar conduct in the past without having been disciplined. Also, there is no record evidence that Ms. Haliburton had been given sufficient notice that conduct of the type exhibited on September 7, 2021 would be considered of such a serious nature that would cause termination despite alleged awareness that this conduct may have existed yet not disciplined. Put another way, Ms. Haliburton had not been notified, either by a more progressive penalty or warning that her continued employment was conditioned on not engaging in conduct repetitive to what the Employer has alleged. Moreover, the record clearly reflects that the Employer considered and credited instances of alleged behaviors by Ms. Haliburton which the Union could not challenge in this proceeding nor, in many of the instances, could not be verified by its witnesses.

*See* **EXHIBIT C**, page 37.  According to this justification for reinstatement, the arbitrator concluded that termination was too harsh based on four separate justifications.  *See* **EXHIBIT C**, page 37.

First, it is worth mentioning the potential bias displayed in the language used in the ORDER.  Specifically, the arbitrator felt reinstatement was warranted, in part, by considering GRIEVANT's "**admirable** lengthy service to the Employer."  While there may be instances in which an employee's years as a union member are considered, the use of the word admirable connotes an appreciation for the GRIEVANT over the EMPLOYER.  There is no mention of the admirable length of time the EMPLOYER continued to employ the GRIEVANT.  The term "service" gives the impression of dedication often attributed to members of the military and suggests the arbitrator has a certain admiration for the GRIEVANT by virtue of her being an employee rather than an employer.

An additional justification used by the arbitrator was based on the absence of evidence in the record that any "interim penalty above, First Reminders or written reprimands, had been issued prior to September 13, 2021."  *See* **EXHIBIT C**, page 37.  He makes this statement after describing the June 23, 2021 and August 20, 2021 Corrective Actions in which he stated that "I credit Ms. Stovall's testimony that the June 23, 2021 form was in fact issued" and that the "August 20, 2021 Corrective Action Form was acknowledged by the Grievant to have been issued."

He referenced the prior Corrective Actions as well as the EMPLOYER's attempt to counsel the GRIEVANT rather than disciplining her.  *See* **EXHIBIT C**, page 15.

He further justified his decision that termination was too harsh a penalty given the absence of evidence that "Ms. Haliburton had been given sufficient notice that conduct of the type exhibited on September 7, 2021 would be considered of such a serious nature that would cause termination despite alleged awareness that this conduct may have existed yet not disciplined."  See **EXHIBIT C**, page 37.  This is no different than reinstating an employee who was terminated for sexually harassing a coworker because, although the conduct is a serious, the employee was never told that the specific violation of sexual harassment would result in her immediate termination.  Not only is this analysis outside the scope of his authority, it also does not pass the reasonable person standard of logic.  Additionally, the arbitrator's position that the GRIEVANT was wrongfully discharged for not first being warned that her behavior could result in termination is specifically contradicted by the arbitrator's own finding cited just a few paragraphs earlier in the ORDER when the arbitrator referenced that GRIEVANT was given a prior warning about her unacceptable behavior.  *See* **EXHIBIT C**, page 15.  Specifically, the arbitrator founds that:

> The record also includes testimony concerning another incident on August 30, 2021, when the State regulatory authority was conducting an unannounced survey of the facility. Ms. Stovall testified that Ms. Haliburton created a disturbance in front of the State auditor and Ms.

Stovall asked Ms. Singletary to calm the Grievant down. During this interaction, the Grievant allegedly called Ms. Stovall a "fucking liar" to her face, while kneeling in front of her. The Grievant categorically denied this interaction, although Ms. Stovall and Ms. Singletary testified that it occurred. The record reflects that the Grievant was not disciplined for this encounter and that this was a conscious decision by Ms. Stovall to instead counsel the Grievant. Ms. Cunningham and Ms. Stovall offered consistent testimony that they prepared a Corrective Action report in response to Ms. Haliburton's behavior, but it was not issued because they believed it would not be constructive in contrast with a coaching. The draft Corrective Action does not appear in the record. Ms. Stovall and Ms. Cunningham both testified that their attempt to informally coach Ms. Haliburton over this incident did not succeed. Because the Employer did not discipline the Grievant, I do not find the incident properly considered as part of her disciplinary history with respect to the Grievant's ultimate termination. However, the testimony is relevant to the extent that it reflected that the Employer shared its concerns with the Grievant by engaging her in counseling.

See **EXHIBIT C**, page 34.

Finally, the last justification mentioned by the arbitrator was that the EMPLOYER "considered and credited instances of alleged behaviors by Ms. Haliburton which the Union could not challenge in this proceeding nor, in many of the instances, could not be verified by its witnesses." However, this point is moot because the arbitrator had already concluded that the GRIEVANT called her coworker an "uncle tom" and stated:

I find the statement was a direct reference to Ms. Singletary and a protest to Ms. Singletary's legitimate interest as an employee and supervisor to report complaints to the Executive Director. The Grievant's conduct by using a racial epithet with respect to a coworker is consistent with the intent and letter of conduct prohibited

by the Employer's policy and has been proven to violate the policy establishing a non-discriminatory workplace.

See **EXHIBIT C**, page 36. Consequently, given that the arbitrator's justifications for reversing the termination are all directly contradicted by the findings of fact that he expressly made, the ORDER was imperfectly executed if not biased.

<u>**CONCLUSION**</u>

The arbitrator is not permitted to decide on the penalty if he agrees that the employee committed the offenses for which she was accused. Having found that the EMPLOYER had just cause but then fashioning his own penalty was a major overreach of his authority and could have devastating consequences on the EMPLOYER's ability to exercise its rights that are clearly outlined in the CBA. In other words, he went beyond his scope that prevented him from altering, amending, changing, adding to or subtracting from "any of the terms" of the CBA and was to **"determine only whether or not there has been a violation."** The ORDER is also completely inconsistent with a clearly defined public policy of eliminating racism and harassment in the workplace. For all the forgoing reasons, the ORDER should be vacated and the termination should stand.

<u>**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 3.01(g)**</u>

Prior to the filing of this motion, undersigned counsel personally conferred with counsel for the Respondent who advised that the Respondent does not oppose the relief sought herein.

Dated:  February 8, 2023  Respectfully submitted,

/s/Ben H. Cristal
Ben H. Cristal
CRISTAL LAW GROUP
Florida Bar No.: 84761
P.O. Box 16680
Clearwater, FL 33766
813-258-8500 phone
813-258-8501 facsimile
E-mail: mail@cristallawgroup.com
Attorney for the Petitioner

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing motion was filed through CM/ECF

on February 8, 2023 and served on the counsel listed below.

By: */s/Ben H. Cristal*
Ben H. Cristal, Esq.
Florida Bar No.: 84761