In the Matter of Arbitration Between:

_____

**PALM GARDEN OF WEST PALM BEACH, LLC**

               "Employer,"

    - and -

**1199 SEIU, UNITED HEALTHCARE WORKERS EAST**

           "Union."

_____

FMCS Case No. 221216-01963
(Terri Haliburton)

                       **OPINION
AND
AWARD**

                       **Before
James W. Mastriani
Arbitrator**

Appearances:

**For the Employer:**
Ben H. Cristal, Esq.
Cristal Law Group

**For the Union:**
Libby Herrera-Navarrete, Esq.
Phillips, Richard & Rind, P.A.

The 1199 SEIU, United Healthcare Workers East, [the "Union" or "SEIU"], filed a grievance on September 18, 2021, alleging that the Palm Garden of West Palm Beach [the "Employer"] did not have just cause to terminate the employment of Terri Haliburton [the "Grievant"], Certified Nurse's Assistant.  After the Employer denied the grievance, it was submitted to arbitration by the Union pursuant to the terms of the parties' collective bargaining agreement [the "Agreement"].  Thereafter, I was designated to serve as arbitrator.

Arbitration hearings were held virtually on April 25 and June 3, 2022.  At the hearings, the parties argued orally, examined and cross-examined witnesses and submitted documentary evidence into the record.  A transcript of the proceeding was taken.  Testimony was received from Kristine Stovall, Executive Director, Shawnta Singletary, Environmental Director, June Edge, Culinary Director, Jennifer Cunningham, Regional Director of Human Resources, Jude Diresme, Vice President of SEIU 1199, Sylvia Williams, Certified Nurse's Assistant, Stephanie Gooden, Certified Nurse's Assistant, Quettie Isoff, Certified Nurse's Assistant, Debra Stanley, Union Organizer and Terri Haliburton, Certified Nurse's Assistant and the Grievant.  Both parties filed post-hearing briefs, the last of which were received on or about August 12, 2022, at which time the record was closed.

## **ISSUE**

At the hearing, the parties agreed to frame the issue to be heard and decided as follows:

> Was the Grievant, Terri Haliburton, terminated for just cause?
> If not, what shall be the remedy?

## **CITED CONTRACTUAL PROVISIONS**

ARTICLE 4 – MANAGEMENT RIGHTS

Section 1.

All rights which ordinarily vest in and are exercised by employers, and all of the rights, powers, and authority possessed by the Facility prior to entering into this collective bargaining agreement, except as expressly and specifically abridged, delegate, granted, or modified by this Agreement, shall continue to vest in the Facility. These rights shall include by way of enumeration and illustration below, but shall not be construed to be limited to the right to hire, promote, demote, layoff, assign, transfer, determine if a vacancy exists, set up and determine the shift hours, determine the number of hours in a shift, suspend, discharge or discipline employees for cause.

ARTICLE 14 – DISCIPLINE AND DISCHARGE

**Section 1.**  Except as stated in Article 15, Section 11, employees may not be disciplined, suspended or discharged except for just cause

…

In case of discharge, the employee affected may request and shall receive from the Employer, in writing, the reason for said dismissal.

…

**Section 4**. All warnings and disciplinary forms in employee's file for infractions shall be removed from the file and not be counted for purposes of progressive discipline after twelve (12) months from the date of the infraction.

…

## CITED EMPLOYER POLICY

### Team Member Handbook
### Standards of Conduct

**Policy**

All Team Members must accept certain responsibilities; adhere to acceptable business practices in matters of conduct and behavior, and exhibit a high degree of personal integrity at all times.

**Expectations of Conduct**

…

For those instances when infractions of Center rules or substandard performances occur, a system of progressive corrective action has been established for all Team Members.  Team Members who are within their 90-day introductory period may be terminated at any time during the introductory period for any minor or major violation and will not be subject to the progressive disciplinary process. '

The purpose of the corrective action procedure is to provide guidance in the areas of job performance or conduct that require improvement.  Disciplinary process will work in conjunction with any/all policy violations including attendance policy. Should your performance fall below our expectation, your Supervisor will meet with you in private to identify the-problem and establish a course of action for improvement. The corrective action procedure normally consists of the following progressive steps: a first written reminder, a second written reminder, final written reminder; and as a last resort, termination from employment.  Serious offenses may require immediate corrective action up to and including termination from employment without resorting to the progressive corrective measures.

…

**Minor Violations:**  The following list of infractions represent examples (not all inclusive) of minor infractions, which after accumulative and/or repeated violations within a twelve (12) month period could result in termination.

…

13.    Failure to treat all residents, visitors, family and fellow Team Members with kindness, respect and dignity.

…

**Major Violations:**  The following list of infractions represent examples (not all inclusive) which, after an incident, could result in immediate termination from employment.

…

17.   Acts of prejudice or discrimination, physical contact / harassment of other Team Members, residents or visitors.

…

22.   Being grossly disrespectful and/or insubordinate to your Supervisor.

### Harassment and Discrimination

The Center is committed to the principle that all Team Members have the right to work in an environment free of discrimination and any form of unlawful harassment based on race, color, religion, age, sex, national origin, disability/handicap, mental status or other protected classification.  To help ensure that no Team Member feels themselves to be subject to discrimination or unlawful harassment, the Center prohibits any offensive physical, written, or spoken conduct regarding any protected trait, including conduct of a sexual nature, off-color jokes, racial, ethnic, or religious slurs or innuendos.

…

(iii)   Verbal abuse or kidding that is oriented toward a prohibited form of unlawful harassment, including that which is sexually oriented and considered unacceptable by another individual. This includes for example, commenting about an individual's national origin, race, color, body or appearance where such comments go beyond mere courtesy; telling "dirty jokes" or racial or ethnic jokes that are unwanted and considered offensive by others; or any tasteless sexually, ethnically or racially oriented comments, innuendos or actions that offend others.

…

(v)   Creating a work environment that is intimidating, hostile, abusive or offensive because of unwelcome or unwanted conversations, suggestions, requests, demands, physical

contacts or attentions, whether sexually oriented or otherwise related to some other form of harassment.

(E. Ex. #5)

## **BACKGROUND**

The Grievant is Terri Haliburton.  She was employed by Palm Garden of West Palm Beach on or about June 18, 1989.  Palm Garden is a long-term care facility.  During the course of her 32 years of employment, she served as a CNA (Certified Nursing Assistant).  She worked the 7:00 a.m. to 3:00 p.m. shift and, on occasion, worked overtime or flex time.  She also assisted in Restorative, and with kitchen staff when it was short staffed.  Her main duties as a CNA included taking care of patients' needs such as meals, baths, and shaves.  She worked regularly with the same staff members on every shift, including staff members in other departments.  While employed, the Grievant's work performance was satisfactory as reflected in the positive annual evaluations she consistently received during the course of her entire employment.  At hearing, Union witnesses Silvia Williams, retired CNA, and CNA Stephanie Gooden offered testimony reflecting Ms. Haliburton's job performance as a good and hard worker, her multi-tasking and occasional work as a team leader.  The Employer cited Ms. Haliburton on January 1, 2020 for her "loyalty, dedication and excellent work…"  (Un. Ex. #2).

The Employer's decision to terminate Ms. Haliburton was not based on her ability to perform the functions of her job but rather on conduct it attributed to her when it issued a September 13, 2021 Corrective Action that terminated her employment:

As a member of the Palm Garden team, you are responsible for exhibiting behaviors that support our Mission, our Commitment to Lead By Example and the excellent customer service our visitors, company representatives, residents, and families as well as our employees expect and deserve.

On Tuesday, 9/7/21 it was reported that you called a fellow team member an "Uncle Tom" when they passed you in the hallway.  It was also reported that you have been heard referring to the Executive Director as a "Cracker". It was also reported by fellow team members that you have exhibited behaviors that are discriminatory, derogatory, intimidating, considered bullying and harassment. Terri this behavior is not appropriate and creates a hostile working environment and does not promote the Palm Garden Mission, Vision, Values.  This behavior is also in direct violation of Palm Garden's Standards of Conduct Guidelines (refer to Pages 35 - 39 of the Employee Handbook), Minor Violation #13- Failure to treat all residents, visitors, families and fellow employees with kindness, respect and dignity and Major Violation #22. Being grossly disrespectful and/or insubordinate to supervisor and Major Violation #17. Acts of prejudice or discrimination, physical contact/harassment of other team members, residents, or visitors.

This not only affects your ability to work together with your peers and team; but also affects our residents/patients.

Terri, you are responsible for being a positive member of our team and providing quality customer service to our residents/patients.   Behaviors such as described above do not contribute to Palm Garden's success and will not be tolerated.

Effective immediately your employment is terminated.

During the time relevant to this case, Kristine Stovall was Executive Director of Palm Garden of West Palm Beach, a position she began on June 24, 2021.  Prior to that, she worked at Palm Garden of Aventura Center beginning in January 2019.  At some point in 2019, while working at Aventura Center, Ms. Stovall first met the Grievant while conducting a "mock survey" of the West Palm Beach facility.  At that time, the two had a brief conversation.  According to Ms. Stovall, while conducting the mock survey, Ms. Haliburton said to her that "if you want to know what's really going on you can talk to me." Ms. Haliburton shared some issues with Ms. Stovall that she believed West Palm Beach

was experiencing, including those relating to CNA staffing assignments.  Ms. Stovall said she shared these concerns with the facility's on-site clinical team.  Ms. Stovall testified that she "did not have a concern" with this first encounter with the Grievant and this was her first and last interaction with Ms. Haliburton before she was assigned the new Executive Director of Palm Garden of West Palm Beach on June 24, 2021.

On June 23, 2021, the day before Ms. Stovall began as Executive Director at West Palm Beach, the Grievant received a Corrective Action, the form reflecting the issuance of disciplinary action as a "First Reminder."  It was issued by Candace Doon who was a Human Resources Manager at the time.  Ms. Stovall described the Corrective Action as regarding Ms. Haliburton's uniform or clothing, as well as exhibiting inappropriate behavior.  The Corrective Action, in pertinent part, states [Er. Ex. #1]:

> Terri, on 6/22/21 the HR manager approached you to ask why you were not dressed in the proper uniform for your shift.  You then proceeded to engage in inappropriate behavior in response, and became disrespectful and aggressive; loudly responding inappropriately to the HR manager's question.
>
> This is in violation of the Palm Garden policy and procedures #22: 'Being grossly disrespectful and insubordinate to your supervisor'; and #4 'Failure to abide by Center dress and grooming codes, including failure to wear required ID badge or uniform, failure to wear and use gait belts.'

The Corrective Action Notification states that the Grievant declined Union representation and declined to sign the form.

Upon questioning by Union counsel, Ms. Stovall acknowledged she had no personal knowledge of this Corrective Action nor any incidents that led up to it because

when it was issued she had not yet started at West Palm Beach.  She testified she became aware of the incident through Candace Doon, a Human Resources Manager who worked at the facility during that time period.  Through Ms. Doon's account to her, Ms. Stovall testified that Ms. Haliburton was disciplined because of her insubordinate reaction to Ms. Doon after being told that her uniform was the wrong color.

The Union cites Ms. Haliburton's testimony that she was not aware of the Corrective Action.  It points to the second Corrective Action Ms. Haliburton received on August 20, 2021 which stated that it was a "First Reminder" which, it argues, supports Ms. Haliburton's testimony that she did not receive the June 23, 2021 Corrective Action.

Ms. Stovall testified that Ms. Haliburton received a second Corrective Action on August 20, 2021.  [Er. Ex. #2].  It states in pertinent part:

> On Friday, 8/20/21, your supervisor attempted to conduct an inservice with you regarding professionalism towards fellow team members/supervisors. During this inservice your behavior became escalated.  You spoke in an elevated tone and made inappropriate comments to your Supervisor and Executive Director.  This behavior is not acceptable and is in violation of Palm Garden's Standards of Conduct Guidelines (refer to Pages 35-39 of the Employee Handbook), minor violation #13-Failure to treat all residents, visitors, families and fellow employees with kindness, respect and dignity and Major Violation #22. Being grossly disrespectful and/or insubordinate to your supervisor. …

> Terri, it is expected that in the future your interactions with fellow team members, supervisors and the Executive Director are professional in nature.  It is understandable to become frustrated at times, however it is expected your conduct remain professional at all times.  Future incidents may result in further corrective action and/or separation of employment.

Ms. Stovall testified directly about the events leading up to and including the conduct stated in the August 20 Corrective Action:

> I had asked our regional nurse to do an in-service with Ms. Terri Haliburton regarding the inappropriate behavior, and Terri Haliburton refused to have the in-service done by the regional nurse.  She stated that if she needed to be in-service it needed to be done by the Executive Director, which is not common—it is common for a regional nurse to be able to do educate people on the clinical team.
>
> However, because of Terri's request I decided to go ahead and attempt to do in-service with her.  During that in-service, which was in my office, Terri Haliburton became very escalated, became aggressive, used inappropriate language, and inappropriate behavior.  So due to that we did this disciplinary action.

Ms. Stovall testified that it is not typical for an "in-service" to be considered discipline, and that the "in-service" was not intended to be a prelude to the Corrective Action.  Rather, she said she intended "to have someone in a critical leadership role spend some time with Terri to educate her and coach her so that she could be successful with us on the Palm Garden team."  Ms. Stovall defined "in-service" as sitting down with a team member, for any purpose large or small, and coaching or educating them about best practices.  She noted that in-services are common.  In this instance, Ms. Stovall initially asked Natalie Jean Baptiste, a regional nurse consultant at the facility, to coach Ms. Haliburton on her tone of voice because she had received complaints about Ms. Haliburton from certain staff members in different Departments.  Specifically, Ms. Stovall testified that complainants had told her that "Terri was using inappropriate language, and behavior, and acting disrespectful" and that at the time she thought that "possibly Terri didn't know that her behavior was hurting other team members."  Ms. Stovall did not testify

to the names of the complainants that caused her to conduct the in-service because she believed that they were afraid of retaliation.

According to Ms. Stovall, she did not originally intend to conduct the in-service herself because she did not think that it would be well received. Instead, she asked Ms. Baptiste to conduct the in-service because Ms. Baptiste worked together with Ms. Haliburton in the past. Ms. Stovall testified Ms. Haliburton refused to do the in-service with Ms. Baptiste and when "they came to my office, and Terri said, if I'm going to be in an in-service, I need to be in in-service by Kristine." Although Ms. Stovall said it would be unusual for the Executive Director to conduct this kind of in-service directly with a CNA, she acquiesced to the Grievant's request. However, she testified the in-service was not successful because the Grievant was not willing to accept the issues she was being coached in and was defiant. Ms. Stovall therefore decided to issue the August 20, 2021 written Corrective Action to Ms. Haliburton indicating it was a "First Reminder." (Er. Ex. #2). Ms. Stovall testified that Jennifer Cunningham, Regional Director of Human Resources, assisted her with preparing the Corrective Action and before issuing she personally reviewed the Grievant's personnel file.

Ms. Stovall testified that after the Grievant received the August 20 Corrective Action she promptly responded with a handwritten statement. (Un. Ex. #11). Her response stated:

8/20/21

To whom it may concern:

I, Terri Haliburton was walking a patient in the hallway when Natalie said to me she need to have a in service with me. I ask her only me. I said to her what is it about she said respect and how to talk to your co-workers. Then I ask Natalie let's go in to Christine (Administrator) [Kristine Stovall] office. Christine started talking about complains about me. She said that she had complains from housekeeping, dietary, supervisor, CNA and a nurse. They didn't ask me do you want a union representatives. Then she said this issue was going on for three weeks. Why would you wait so long to address them. I ask you to bring them in the office and you said no. You cannot go by hearsay when you go to Court. You have to have names. When I was telling Christine I went to dietary and ask about the complaint she had told me I should have not. She fill like when you speak to her, you have behavior problem and being aggressive.[1]

Additionally, Ms. Stovall testified that she learned that Ms. Haliburton sought to identify the complainants that led to Ms. Stovall's decision to coach her. She testified that Ms. Haliburton was "going throughout the center and asking many team members if they had, you know, 'are you the one that went to Kristine? Why would you go talk to Kristine?'" This, Ms. Stovall testified, included "going into peoples' offices and approaching them while they were caring for residents."

The Union submits that the Corrective Action was deficient because it did not contain specificity as to what comments the Grievant allegedly made or to whom.

Ms. Stovall also offered testimony in connection with another incident that occurred while a State surveyor/investigator was on premises on August 30, 2021. According to Ms. Stovall:

I was standing in the hallway, it was very early in the morning. I believe it was around 7:00, 7:15 in the morning. And I was standing in the morning

---

[1] The statement continues onto a second page which does not appear in the record.

talking to the surveyor.  It was one surveyor who was here on a complaint survey, and Terri in a mocking way came up behind me and said 'lies, lies, lies.  There is Kristine always telling stories, stories, stories.'

And again, what the surveyor said to me, and so she [Terri] walked past me and went into the break room.  And that's when I walked in and that's when Terri became even more escalated, and she at one point got down on her knee and was, you know, you are a—I won't say what she said but, you know, you are an effing liar, you are—all you do is make up lies.  Throwing her hands up, just being very aggressive, inappropriate behavior in the break room…

I walked away at that point because Terri was so escalated and we were in the middle of the survey and the surveyor has been asking for information.  So at that point I needed to focus on the survey.

Ms. Stovall further testified that during the confrontation, the Grievant was:

Throwing her hands, raising her voice, bucking shoulders, using her fist, and kind of making this motion (indicating), just very escalated.  You can see, you know, when someone escalates the color in their face changes a little bit and veins in your neck start to bulge, and you can see she was very escalated.

Ms. Stovall testified that at the time "there were several team members in the break room.  There were also other team members in the hallway."  Ms. Stovall stated that those witnesses were "unwilling to come before you today to share because they are terrified of the retaliation that would happen if they were to share."

Ms. Stovall testified that she initially wrote another Corrective Action for Ms. Haliburton in response to her behavior in front of the state surveyor.  However, Ms. Stovall decided not to issue the form.  She explained: "I really wanted to be able to coach Terri and spend time with her."  Ms. Stovall then brought together Gary Lackey, Vice President

of Operations, Jacqueline France, Director of Education, Elvira Joseph, a Union delegate, and Terri Haliburton in her office to discuss the incident.  She described the meeting:

> [We] spent quite a bit of time talking through with Terri, trying to coach her on ways that, you know, things that were inappropriate and how her behavior had made me feel, had made my surveyor feel, how it could be considered abusive or aggressive if a resident was to hear it.
>
> And we spent a lot of time giving examples, walking her through things that had happened that I had witnessed, that other people had witnessed.  And after about 35, 45 minutes of us having this conversation and coaching, and Elvira even being present, and yes, yes, all of us in agreement that this behavior is inappropriate Terri stood up and said, 'oh whatever, sweetheart, it's your building, do what you want,' and stormed out of my office.

Ms. Stovall testified to her reasons not to issue the Corrective Action she had already written but had not issued for the August 30, 2021 incident.  She said:  "I just thought, honestly, I didn't think she would receive it (Corrective Action) well, and I thought that she would receive it better with coaching…I made multiple efforts with Terri to create an environment where she could be coached and she can improve on her behavior.  So that's why I chose not to do Corrective Action on that day."

The incident that lead to the Grievant's termination occurred on September 7, 2021.  It involved Shawnta Singletary, the Director of Environmental Services.  She was a recent hire during the events in question, having begun work for Palm Garden on June 12, 2021.  She oversees the housekeepers on staff, including handling scheduling and supply purchasing.  As such, she works closely with the CNAs in the building.  She initially offered testimony concerning the Grievant's conduct.  She testified that during her first interaction with Ms. Haliburton, Ms. Haliburton told her "don't go kissing that white

woman's ass," a reference to Ms. Stovall.  Ms. Singletary testified that she did not report it and brushed the comment off.

Ms. Singletary also offered testimony about witnessing the Grievant's conduct in front of the State surveyor/auditor on August 30, 2021.  This was the incident that Ms. Stovall said she had written a Corrective Action Form but decided to counsel Ms. Haliburton instead of discipling her.  According to Ms. Singletary, Ms. Haliburton loudly accused Ms. Stovall of being a liar:

> I believe I arrived at 7:00…So I signed myself in, I did my temperature check.  So as I'm doing that I hear a lot of yelling from a woman.  So once I finished signing myself in I proceed to walk inside of the building.  We have a door to go inside of the facility.
>
> So I'm by the elevator and I hear, 'Kristine, you are a liar, you are a liar.' She is like yelling and Kristine is basically telling her to calm down.  I believe she said, the State is in the building, you need to calm down…Kristine asked me can I be her witness because she didn't know what was going on with Terri, and I told her, okay, I can be your witness.  She was on one knee, she had her hands together like you are praying, and she said, I swear to God, Kristine, you are an effing liar.  She cursed. …
>
> And she goes to say, I went to different departments and I even went to her which is myself [Singletary], that you said that I was inappropriate, you said that I wasn't a great person to work with, I wasn't getting my job done, and they all said that you are a liar, that that never happened.
>
> And then she also was pasting her pocket where her phone was because Kristine told her that the State was there, and she was like, I don't care, you know, if the state is here, I have enough in my pocket in my phone to show the State because I have pictures of what's going on in Palm Garden.
>
> So I told her that she needs to calm down, you know, step outside, get some fresh air.  And Kristine told her, maybe you should clock out and go home because today is not the day for you.  And she is like, I'm not going anywhere, I'm going anywhere because we are short staffed and I'm not going anywhere and don't talk to me you liar.

Ms. Singletary stated that this interaction happened in the break room, and that she witnessed it from the doorway between the hallway where she had just been and in the break room where Ms. Stovall and Ms. Haliburton were.  Ms. Singletary testified that Ms. Haliburton was "loud and aggressive" and that Ms. Stovall did not raise her voice. She testified she heard Ms. Haliburton yelling at Ms. Stovall saying she (Ms. Stovall) was a liar.  Ms. Singletary said that Ms. Stovall attempted to calm Ms. Haliburton down, in light of the fact that "the State was in the building," referring to the surveyor from the State regulatory agency that oversees Palm Garden and who was inspecting the facility.  Ms. Singletary testified she walked Ms. Haliburton outside to try to calm her down.  June Edge[2], another staff member, testified that she was a witness to this conversation:

> I didn't hear the actual conversation, but I did see Shawnta try to calm her down for some reason, and the only way I saw that was because she was trying to calm her down right in front of the Dietary door.  And that's how I found out what happened.  And Shawnta was trying to calm her down., but it wasn't working.

Ms. Singletary also testified that approximately two weeks prior to the August 30, 2021 incident, Ms. Haliburton had interacted with her around 9:00 a.m. in the break room.  Ms. Singletary stated that at the time she had only been there for about two weeks.  She testified Ms. Haliburton approached her in front of coworkers and loudly asked her "do you have a problem with me?"  Ms. Singletary testified that she told Ms. Haliburton that she didn't know her and did not have a problem with her.  Ms. Singletary testified that

---

[2] Ms. Edge testified about various topics relating to Ms. Haliburton, but explicitly stated that she had not witnessed the Grievant being intimidating to anyone other than to her [Edge].  She then testified about an occasion in which the Grievant allegedly confronted her about Ms. Edge's complaints to management about the Grievant.  Edge stated that during this conversation, the Grievant referred to Ms. Stovall as a "cracker" and a "giraffe."  However, she did not report this conduct to the Employer.

during this conversation, she heard Ms. Haliburton refer to Ms. Stovall as "that giraffe." This was not reported nor any disciplinary action taken.

The September 7, 2021 incident that led the Employer to terminate the Grievant was described in the testimony of Ms. Stovall:

> A team member [Shawnta Singletary] came to me and reported to me that she felt like she was being bullied.  So Terri Haliburton's behavior had escalated from inappropriate to bullying, and whenever a team member makes an accusation like that, we do an investigation…So I asked Jennifer [Cunningham] if she would please do an investigation regarding this.  So Jennifer started an investigation with the accusation that Terri Haliburton had had bullying [sic] and aggressive behavior, including making racial comments about another team member calling her an Uncle Tom and calling me a cracker.

Ms. Stovall further testified that Ms. Singletary explained to her that "she had attempted to coach Terri on multiple instances on how she could control her anger." However, according to Ms. Stovall, Ms. Singletary explained that she was feeling bullied and threatened by Ms. Haliburton and was aware she was not receiving the coachings nor in-service well.  It was during this conversation that Ms. Singletary allegedly told Ms. Stovall that Ms. Haliburton called Ms. Singletary an "uncle tom" to her face, on that day, and in the past had referred to Ms. Stovall as a "cracker."

Ms. Singletary offered testimony about this September 7, 2021 incident.  She stated:

> So this day me and Kristine was in the hallway and we was talking and I seen Terri roll her eyes and she kept walking.  So I paid it no mind.  So after walking down 100 wing, that's the part of the unit that she works, I looked

over and I looked her in the face and I believe she called me an 'uncle tom ass bitch.'

She said it in my face.  So I went to my office.  I was so angry because I'm like, you know, I have done nothing to this woman, she doesn't know me, and I treated her with nothing but kindness.  I even talked to her to calm her down a couple of days before.  So I said, you know, let me go and talk to Kristine because this is getting ridiculous.

I went into Kristine's office and I explained to her what happened.  And from what I can remember, I remember her saying Shawnta, I've told you to write a statement.  Honestly because she'd been here so long I know if I wrote a statement she would have been out the door, but it's like her behavior repeatedly just the same attitude, aggression.  So it's like, you know, I had to write a statement.

Ms. Singletary testified that she previously heard coworkers say they heard Ms. Haliburton call Ms. Singletary an "uncle tom" but that this was the first time she heard it for herself.  She further stated that Ms. Haliburton made eye contact with her while saying "uncle tom ass bitch" which led her believe that Ms. Haliburton was referring to her.  Ms. Singletary said she did not respond to Ms. Haliburton, and reported it directly to Ms. Stovall.

Ms. Stovall testified that upon receiving the complaint from Ms. Singletary on September 7, 2021, she directed Jennifer Cunningham, Human Resources Manager for Palm Healthcare Management, to begin an investigation.  At the same time, Ms. Stovall "removed the Grievant from the calendar" pending the outcome of Ms. Cunningham's investigation.  Ms. Stovall testified that she did this "to do a clean investigation and to protect the team members at Palm Garden."

Ms. Cunningham testified to her role in the investigation to which she was assigned. As the Human Resources Manager for Palm Healthcare Management, she provides regional support for Palm Garden of West Palm Beach's internal Human Resources Department with respect to discipline, corrective action, training, mentoring, investigations, payroll, and workers' compensation. She testified she was familiar with the Team Member Handbook. She stated that the Handbook defines Minor and Major violations. Minor violations "could be an infraction that a team member commits that may follow through the progressive discipline." She testified that Major violations are severe enough that they could end in termination, even for a first offense. Ms. Cunningham did not have a role in drafting the June 23, 2021 Corrective Action and was not involved in the incident. She acknowledged she did "assist with drafting and providing guidance" for the August 20 Corrective Action, although she "was not a witness to the behavior that resulted in this corrective action." She did, however, interview the employees that complained about Ms. Haliburton's conduct which led to an attempt to coach her.

Ms. Stovall testified about the result of the investigation. She testified, "we did find that Terri was using racial comments and was being blatantly disrespectful, bullying behavior, inappropriate, and we decided on 9/13 to terminate the Employment of Terri Haliburton." Ms. Stovall testified that "after multiple interviews we were seeing that there were multiple people who had heard Terri use racial comments and have aggressive behavior," not limited to the incident involving Ms. Singletary. Ms. Stovall stated that they "were seeing a pattern" in the Grievant's workplace behavior.

Ms. Cunningham interviewed Ms. Singletary as part of the investigation. Ms. Singletary testified she told Ms. Cunningham "how many workers came to me and was telling me that she was calling me [uncle tom], and then I also told her I went down 100 wing and she said it in my face. So I wrote the statement after that." Ms. Singletary also told Ms. Cunningham she heard that the Grievant call Ms. Stovall a "cracker" on multiple occasions. She testified that she told Ms. Cunningham that "this was when we was walking out the door, she had called her that. She was like, I know this woman is trying to fire me, this cracker, I'm going to show her that she cannot get rid of me." Ms. Singletary disputed the Grievant's account that she was only speaking in general about "uncle toms," and said that she believed the Grievant was talking about her, and to her, when she said the word "uncle tom" … "she definitely directed those words towards me." Ms. Singletary also provided a written report of the Grievant's behavior in connection with the August 30, 2021 incident when Ms. Stovall decided to provide an in-service rather than discipline. It stated:

> I Shawnta Singletary Director of Environmental Services had an experience on August 30 at 7:15 am. I was asked to be a witness by Kristina [sic] because one of the CNA which is Terry [sic] was very loud and rude towards Kristina. She started to yell out that Kristina was a liar and she ask all the employees about the lies that Kristina told her she implied that Kristina said that she was very rude and unprofessional and inappropriate to others and Terry also says she has a lot of things that's in her phone that she's going to show the inspection people and also OSHA. When I try to calm the situation down Terry got on one knee and she says I swear to God that Kristina is a liar and I told Terry to calm down and also Kristina told her to go home to come down [sic] we have inspection today. Terry replied by telling Kristine that she's not going home. So as me and Terry walked away from Kristina she started using racial slur she called Kristina a cracker she told me don't kiss her behind and basically what I was trying to do is calm her down by letting her know she has too many years here to lose her job behind nonsense. Terry finally calm down and she was OK for that day. Today September 7, 2021 I'm walking down 100 hallway and hear Terri

saying the word uncle Tom and when I looked at her she called me a uncle Tom.  I don't know what that was about but I didn't say anything to her at this point is bullying.

Ms. Cunningham's testimony included documentation of her investigation regarding Ms. Singletary's account of Ms. Haliburton's conduct:

> **Accuser** interviewed on 9/7/21-team member stated that she was coming down the hallway towards Laundry and when passing Terri Haliburton, Terri looked at her and called her an "Uncle Tom."  Team member reported that this was not the first time Terri has made a derogatory and racist comment to her.  Accuser stated that on two prior incidents Terri had referred to the Executive Director as a "cracker" and told witness she would not stick up or listen to Executive Director.  Accuser stated she felt that Terri's behavior was bullying and felt harassed by Terri.

Ms. Cunningham also produced notes in connection with two additional witness accounts given to her by unnamed staff members who she said corroborated Ms. Singletary's account.  Ms. Cunningham testified that Ms. Singletary had referred both witnesses to her.  The Union objected to the introduction of the notes as hearsay as well as having come from unidentified persons.  They were admitted into the record as reflecting they were received by Ms. Cunningham during her investigation.  However, I reserved on the weight, if any, to be given to their contents.  After review, I cannot give any weight to the substance of the notes given the inability of the Union to identify the individuals present any rebuttal evidence or to cross-examine the alleged witnesses.

Ms. Cunningham also testified that on September 7, when they interviewed Ms. Haliburton during the investigation and removed her from the calendar, Ms. Haliburton

provided a written statement explaining her view of the alleged events.  That statement appears in the record:

> I Terri Haliburton was call [sic] to HR office about 2:15 PM Sept. 7, 2021. Jennifer, Kristine, and Elvira was there.  Kristine said that a staff member said I was bullying her.  A coworker was talking to me about short staff.  She was complained that she worked the floor alone.  I said to her you have to be careful around here you have some uncle tom I didn't call any name.  So you mean that I cannot talk with a co-worker.

Ms. Cunningham testified that Ms. Haliburton denied all of the accusations, including calling Ms. Stovall a cracker and bullying or intimidating any members of the staff.

On September 13, 2021, upon the completion of Ms. Cunningham's investigation, the Grievant received another Corrective Action, this one calling for her discharge.  It provides in pertinent part:

> On Tuesday 9/7/21 it was reported that you called a fellow team member an "Uncle Tom" when they passed you in the hallway.  It was also reported that you have been heard referring to the Executive Director as a "cracker." It was also reported by fellow team members that you have exhibited behaviors that are discriminatory, derogatory, intimidating, considered bullying and harassment.  Terri this behavior is not appropriate and creates a hostile working environment and does not promote the Palm Garden Mission, Vision, Values.  This behavior is also in direct violation of Palm Garden's Standards of Conduct Guidelines (refer to Pages 35-39 of the Employee Handbook), Minor Violation #13-Failure to treat all residents, visitors, families and fellow employees with kindness, respect, and dignity and major Violation #22, Being grossly disrespectful and/or insubordinate to supervisor and Major Violation #17, Acts of prejudice or discrimination, physical contact/harassment of other team members, residents, or visitors.

Ms. Stovall testified on cross-examination that she received complaints from many employees who said they were "terrified" of the Grievant and did not want to share their identity.  She testified:

> I have team members in my office crying about how scared they are.  How they are afraid they are going to get shot on the way home, how they have to park in a certain spot in our parking lot because Terri has sent them texts…I have seen my team members park their cars in certain spots in the parking lot so that they will be by the security camera.  I've also seen my team members ask other people to pick them up because they are afraid they are going to be followed home from work.

Ms. Stovall testified that she did not "believe they were making this up," but acknowledged, upon questioning by Union counsel, that she did not conduct an independent investigation into the veracity of these claims.  She said that she did not know that these claims were true "for sure," but that she believed the claims because "I've seen Terri's behavior for myself…and based on what I know of Terri, how my personal interactions with her, those type of statements are not surprising to me."  I reserved on the Union's objection to this testimony and, while not discrediting Ms. Cunningham's sincerity that she received this information, it cannot be given any weight due to the Union's inability to identify the team members, cross-examine them or provide rebuttal evidence.

Ms. Haliburton testified on her own behalf.  She first described her employment history.  She was hired on June 18, 1989 as a CNA.  She worked as a CNA but helped out in Restorative and Dietary if they were short on help.  She testified she would serve "breakfast, lunch, and give them a bath and a shave and so forth."  She said she never

had any problems with any coworkers on her shift. She testified she never received a bad evaluation in 32 years of service. The evaluations in the record support her testimony. At some point in August 2021, she heard from Ms. Stovall that some employees had problems with her. According to the Grievant, she never met with Ms. Stovall one-on-one before her termination, in contradiction to Ms. Stovall's testimony that she met briefly with Ms. Haliburton during her mock survey shortly before she first started at Palm Garden. Ms. Haliburton did recall that Candace Doon, a fill-in Human Resources Manager, coached her about respect. She testified she did not know that she had received written discipline for her interaction with Ms. Doon in June 2021. She denied her behavior became escalated with coach Natalie Jean Baptiste on August 20. She said: "I thought she was going to have a meeting with the whole floor. And like she only picked me out. And like I said, I felt like it was coming from Kristine…" "She [Natalie] said she wanted to give me an in-service because I was being very disrespectful. And I knew I had not been disrespectful towards my co-workers…And then I asked her. I said, well, let's go to the office. And we went to Kristine's office…Then I asked Kristine, why was it just only me you're giving an in-service to." Ms. Haliburton could not recall what Ms. Stovall's response was to this statement. She denied she raised her voice to Ms. Stovall: "She didn't know my tone of voice…I've always talked in like a heavy like voice, and they said it was aggressive."

She denied she made inappropriate comments during the August 20 in-service. She acknowledged going to Dietary and confronting Ms. Edge about her having complained to Ms. Stovall about her. Ms. Edge denied she said anything to Ms. Stovall

about the Grievant.  The Grievant testified she was not interviewed after she was taken off the calendar.  According to the Grievant, the sole interview for the investigation that led to her discharge was when she talked to Ms. Cunningham when she was removed on September 7, 2021.  She acknowledged she gave a written statement to Ms. Cunningham that day.  She testified that she was talking about the short-staffed facility with co-worker Patricia Tillman in the hallway at the time Shawnta Singletary came around the corner. Although she acknowledged making a general statement about having to watch out for "uncle toms," she denied she called Ms. Singletary an "uncle tom."  She testified on direct examination:

> Q:    So what were you and her talking about?
>
> A:    About the short of staff in here.  How she had to work with like 40 something patients by herself.
>
> Q:    Okay.  So was there anyone around when you were having this discussion with her?
>
> A:    No.  But the housekeeper [Singletary] that she passed through as we were talking.
>
> Q:    Okay.  And the housekeeper that you're referring to is a lady that's been identified now as Shawnta Singletary?
>
> A:    Exactly.
>
> Q:    Did you ever address that comment to Shawnta Singletary?
>
> A:    Not at all.
>
> Q:    Did you ever have any problems before with Shawnta Singletary?
>
> A:    No.  She was only there for two or three months.  I didn't have anything to do with her.  She was new.

The Grievant denied that she ever referred to Ms. Stovall as a "cracker." She did not deny using the term "uncle tom." Ms. Haliburton testified that she was not interviewed by AHCA[3] employees in connection with the short staffing issue. She confirmed on cross-examination that she was familiar with the Team Member Handbook and that she had recently signed one on November 17, 2020. Upon questioning by Company counsel, she testified as to her alleged use of derogatory terms:

Q: Why were you talking about referring to someone as Uncle Tom or saying the phrase Uncle Tom?

A: Well, like I said, sometimes Black Americans choose to go around and tell Caucasian that that's something that mean like a Uncle Tom.

When you're talking like I said, they'll go back and tell the next person what you're talking about.

I'm telling you that that's what I feel like happened. Like what I said here, you're going around telling people if someone is talking in the hallway and you go right around and repeat it to the bigger person here, and that's what we're saying is an Uncle Tom. No meaning no harm.

Q: Okay. So for example, if you were talking to someone else about Kristine and referred to her and then that person went and told Kristine, that person would be an Uncle Tom for going back and telling the boss?

A. Yes.

Q: And that's because they are essentially in a way siding with the boss instead of you when you had a private conversation with them, right?

A: I didn't have a private conversation with that person. I was talking to someone else about the situation of short-staffing.

Q: So who were you referring to as Uncle Tom?

A: Well, the person that passed through.

---

[3] The Florida Agency for Health Care Administration, the regulatory agency that regulates the employees and who reviewed claims of short staffing at Palm Garden.

Q:     Okay.  And so that was Shawnta Singletary?

A:     Well, she was passing through.

Q:     And so you then when referring to this team member, you were saying since she went and told on her to Kristine, you're referring to her as an Uncle Tom because she told on you.

A:     Yes.

        Like I said, I was not talking to her.  She took it the way she wanted to take it.  I was just telling that Pat, the lady that was working, that me and her was talking you have to be careful because there's Uncle Tom here.  Like I say, I didn't really know who went and told it here.

According to the Grievant, she had never used the phrase "uncle tom" before this incident.  "I did not call anyone an Uncle Tom.  Like I said, I was talking to my co-worker where we was talking in the hallway."  She denied calling Ms. Stovall a "giraffe" or a "cracker."  She also denied the August 30 allegations that she tried to interfere with the state auditor's inspection by calling Ms. Stovall a liar.

## DISCUSSION

I have thoroughly reviewed and carefully considered the evidence and arguments submitted into the record by the Employer and the Union in support of their respective positions.  The Employer has the burden to establish that it had just cause to terminate the Grievant's employment.  The disposition of the merits of the grievance must be rendered on the credible evidence set forth in the record of this proceeding.  The parties' full arguments on the issues relevant to whether there was just cause for the termination have been fully considered in the analysis.

The Employer contends it met its burden.  It submits it has established it terminated the Grievant for violating Minor and Major policies in the Team Member Handbook and that the penalty of termination for her September 7, 2021 conduct, standing alone, or in conjunction with recent prior disciplinary actions, was commensurate with the conduct it has proven.  Specifically, the final Corrective Action sets forth that the Grievant "called a fellow team member an 'uncle tom' when they passed you in the hallway," that "you referred to the Executive Director as a "cracker" and that "you have exhibited behaviors that are discriminatory, derogatory, intimidating, considered bullying, and harassment." The Employer also considered the two instances of prior discipline involving minor and major violations within the contractual lookback period when it made its determination.  In sum, the Employer submits it has proven that the Grievant engaged overall in the following violations.

- #22 - [Major] - Being grossly disrespectful and/or insubordinate to your Supervisor
- #17 - [Major] - Acts of prejudice or discrimination, physical contact/ harassment of other team members, residents or visitors
- #13 - [Minor] - Failure to treat all residents, visitors, families, and fellow Team Members with kindness, respect and dignity.

The Union argues that the Employer failed to produce sufficient testimony to prove that Ms. Haliburton created a hostile work environment, harassed, or intimidated her coworkers and colleagues.  It further submits that the Employer relied on unidentified sources who made prejudicial claims that could not be challenged by the Union due to their anonymity and their failure to testify.

The Union further contends that it has established the termination was motivated by Employer retaliation for Ms. Haliburton's role in the Union's effort to protest short-staffing.  At the time, Ms. Haliburton was a member of the Union's bargaining team and, citing testimony from SEIU Vice-President Diresme, the Union filed an AHCA complaint which resulted in a facility visit by its Health Quality Assurance Division in mid-May 2021, just prior to Ms. Haliburton's receipt of her First Corrective Action on June 23, 2021.  (Un. Ex. #3).  The Union points to a video on local television which highlighted the Union's role on this issue which ultimately resulted in AHCA directives to the Employer to correct short-staffing.  The Union finds support for its allegation in the testimony of Quettie Isoff, a long-term employee at Palm Garden, Stephanie Gooden, also a long-term employee and Union Organizer Debra Stanley, all of whom referenced that there was union activity linked to protesting short-staffing and Ms. Haliburton's role on this topic.  Ms. Stanley also addressed the Employer's unsuccessful effort to have the NLRB find the Union guilty of committing an unfair labor practice during the relevant time period during negotiations and short-staffing protests.[4]

The events prompting the termination occurred against the backdrop of the ongoing COVID-19 pandemic.  At the time, the Employer's facility became short-staffed.  This workplace issues was present during negotiations between the Union and the Employer as they pursued achieving their most recent contract.  The testimony of SEIU Vice-President Jude Diresme was credible that this issue was an active one during negotiations.  He also testified that the Grievant was a member of the bargaining team.

---

[4] The NLRB ULP charge and its dismissal were submitted into evidence.

During this period of time, Ms. Stovall and Ms. Singletary began working at the facility. There was an unfair labor practice filing with the NLRB by the Employer accusing the Union of interfering with its ability to collectively bargain.  Testimony and documents reflect that the charge was administratively dismissed by the NLRB without a complaint filed against the Union.  I do not find the merits of the charge to be relevant to this proceeding but does reflect ongoing tensions during the relevant time period.

The Grievant testified, as did supporting witnesses, that she was vocally critical of the short staffing.  However, after review of the overall record, there is no evidence that the disciplinary actions she received were motivated, in part or in whole, by Employer retaliation due to Ms. Haliburton's union activity nor from any concerns she may have expressed or actions she took because of this issue.  Similarly, I do not find that the reasons given by the Employer to discipline her were a pretext to remove her from employment.  Accordingly, the question as to whether there was just cause for the termination must focus on the conduct that the Employer found to be the basis for the disciplinary action.

In respect to prior discipline, the Grievant received a Corrective Action on June 23, 2021 not being in proper uniform and exhibiting for confrontational behavior with Candace Doon, a Human Resources Manager.  The Grievant also received a second Corrective Action dated August 20, 2021 stating that the Grievant failed to treat Natalie Jean Baptiste, the individual who was assigned to hold an in-service with the Grievant, with dignity and respect, as well as similar behavior during interactions with the Executive

Director, Ms. Stovall in connection with the in-service.  It alleged that the Grievant "spoke in an elevated tone and made inappropriate comments to your Supervisor and Executive Director."   Ms. Stovall testified that the Grievant was disrespectful to her when she attempted to conduct in-service with her after the intervention by Ms. Baptiste was unsuccessful.   The two prior Corrective Actions were timely raised in this proceeding because they were issued during the "lookback" period.   The Grievant denied being disrespectful or making inappropriate comments during these two events.   She asserts she was not given the First Corrective Action and was unaware of it until this arbitration hearing.   She also disputes the allegations that underpin the Employer's reasoning for issuing the Second Corrective Action on August 20, 2021.

In respect to the two prior Corrective Actions, I credit Ms. Stovall's testimony that the June 23, 2021 form was in fact issued.  The form was a First Reminder, the equivalent of a written reprimand.  Ms. Stovall testified credibly that the former Human Resources Manager briefed her on the reason for its issuance.  The form itself, though not signed by Ms. Haliburton, reflects that she had declined union representation and declined to sign the form.  Ms. Haliburton's rejection of her knowledge of the form, absent other evidence, must be weighed against Ms. Stovall's testimony and the notations on the form which I find support a reasonable presumption that it was in fact issued.

The August 20, 2021 Corrective Action Form was acknowledged by the Grievant to have been issued.  It also stated it was a First Reminder, again the equivalent of a written reprimand.  This proceeding does not extend to determining the merits of the June

23, 2021 or the August 20, 2021 Corrective Action.  it must be presumed, absent direct challenges by way of grievance, that they have been part of the Grievant's prior work record prior to the issuance of the September 13, 2021 Corrective Action for the September 7, 2021 events.   The relevance and weight to be given to the two First Reminders will be determined while reviewing the merits of the Employer's decision to discipline and terminate Ms. Haliburton based on the events of September 7, 2021.

The event that triggered the discharge was the Grievant's confrontation with Environmental Director Singletary on September 7, 2021.  Ms. Singletary testified that while she passed by in the hallway, the Grievant made eye contact with her and called her an "uncle tom-ass bitch."[5]  Ms. Singletary believed that the Grievant called her this because she had spoken to Ms. Stovall about how the Grievant treated other employees. Ms. Haliburton acknowledged in her testimony, as well as in a statement she submitted contemporaneously as part of the investigation, that she did use the term "uncle tom." Her testimony shows that she understood the term to have a racial connotation and that she meant it to mean someone who informs on a colleague to a superior.  Ms. Singletary testified clearly that the term was directed to her.  The Grievant confirmed that she meant it to refer to Ms. Singletary, but emphasized that although Ms. Singletary was in the general area, she was not talking to Ms. Singletary at the time but to a fellow employee when she used the term.  The Grievant also testified that she had never used the word "uncle tom" before September 7, 2021, or since, but acknowledged in her testimony that she understood its meaning.  Ms. Haliburton's co-worker did not testify.

---

[5] I note that in Ms. Singletary's written memo on the event she only referred to the Grievant saying "Uncle Tom" without mention of "ass bitch."

Based on the overall record, I do not find the Grievant's testimony with respect to the September 7, 2021 event to be consistent with the totality of the events.  The Grievant's belief that she used the word "uncle tom" but not in an inappropriate and harmful way is unsupported and not consistent with relevant surrounding circumstances. Her claim that she used the term simply as a description is outweighed by her acknowledgement that she was looking at Ms. Singletary and meant the term towards her as she passed in the hallway.  It is not in dispute that Ms. Singletary was present when the statement was made.  I find Ms. Singletary's testimony about the event credible.  She identified that the Grievant was talking with another team member and when Ms. Singletary made eye contact with Ms. Haliburton, she then used the term "uncle tom" at precisely that moment.  Even assuming the Grievant's sincerity on this point, the circumstances under which she uttered this disparaging term, by her own acknowledgment, was precisely consistent with the normal intent of the usage of the expression; namely, that Ms. Singletary, an African American woman, reported negatively about the Grievant's conduct to her Caucasian superior.  The record supports the Employer's argument that the Grievant committed a major violation by engaging in "behaviors that are discriminatory, derogatory, intimidating, considered bullying and harassment."  Moreover, Director Singletary had supervisory authority and the slur was made in the presence of a fellow employee.  Ms. Haliburton acknowledged being noticed on the policy she violated.  Accordingly, I find the Employer has met its burden to have had just cause to have issued disciplinary action for this conduct.

Another allegation is that the Grievant referred to Ms. Stovall as a "cracker."  This, like "uncle tom," is a disrespectful race-based epithet.  Ms. Singletary testified that Ms. Haliburton uttered "cracker" on multiple occasions in the past, while she was venting her frustrations about Ms. Stovall.  The Grievant categorically denied ever referring to Ms. Stovall as a "cracker," or having to ever before using the word "cracker."  She also denied the allegation, advanced by the Employer's witnesses that in the past, that she referred to Ms. Stovall as a "giraffe," a reference to Ms. Stovall's height.  Unlike Ms. Singletary's account of the situation in which she saw and heard the Grievant refer to her as an "uncle tom," the evidence surrounding the claim that the Grievant referred to Ms. Stovall as a "cracker" is not sufficiently clear to support this allegation despite the testimony that employees were aware that such statements had been made in the past.  There was no reporting of this to anyone nor any disciplinary action taken at the times the comments were allegedly made or thereafter.  These observations also apply to the alleged "giraffe" comment.  Thus, the allegation that the Grievant violated the Team Member Handbook policies against discrimination and harassment as to these comments cannot be sustained.

The record also includes testimony concerning another incident on August 30, 2021, when the State regulatory authority was conducting an unannounced survey of the facility.  Ms. Stovall testified that Ms. Haliburton created a disturbance in front of the State auditor and Ms. Stovall asked Ms. Singletary to calm the Grievant down.  During this interaction, the Grievant allegedly called Ms. Stovall a "fucking liar" to her face, while kneeling in front of her.  The Grievant categorically denied this interaction, although Ms.

Stovall and Ms. Singletary testified that it occurred. The record reflects that the Grievant was not disciplined for this encounter and that this was a conscious decision by Ms. Stovall to instead counsel the Grievant. Ms. Cunningham and Ms. Stovall offered consistent testimony that they prepared a Corrective Action report in response to Ms. Haliburton's behavior, but it was not issued because they believed it would not be constructive in contrast with a coaching. The draft Corrective Action does not appear in the record. Ms. Stovall and Ms. Cunningham both testified that their attempt to informally coach Ms. Haliburton over this incident did not succeed. Because the Employer did not discipline the Grievant, I do not find the incident properly considered as part of her disciplinary history with respect to the Grievant's ultimate termination. However, the testimony is relevant to the extent that it reflected that the Employer shared its concerns with the Grievant by engaging her in counseling.

In addition to the testimony and Corrective Action reports, the Employer produced a series of written summaries from anonymous witnesses who were interviewed by Ms. Cunningham during the investigation. The Employer submits statements of several unidentified witnesses were not subject to cross-examination. These statements cannot be given weight in support of the claim that the Grievant violated the policy prohibiting harassment and bullying. Consistent with the Union's argument on this point, the anonymous statements cannot be authenticated, addressed by the Grievant prior to or at hearing nor tested through cross-examination, I have determined that the statements presented by the Employer alleging the Grievant's misconduct cannot be considered to support disciplinary action.

Having found that there was just cause for disciplinary action based on the September 7, 2021 events, I next turn to the issue of penalty. The Employer terminated the Grievant for Major Violations 17 and 22, finding racial discrimination and gross insubordination, respectively. The Employer also acknowledged it considered the two prior Corrective Action disciplines within the one-year contractual lookback period, which were issued on June 23 and August 20, 2021. Ms. Stovall and Ms. Cunningham testified that any Major violation can, but does not necessarily, lead to summary discharge. The Union argues forcefully that the Grievant's long term of service (32 years) without prior discipline before June 23, 2021, coupled with positive references to her character and the quality of her work over the course of her career are all factors which mitigate against the penalty of termination.

The Employer's interest in maintaining a respectful and non-discriminatory environment for its employees, residents, and visitors is self-evident. Its policies have not been challenged. The Grievant acknowledged that she used the phrase "uncle tom" in reference to Ms. Singletary who brought complaints about her behavior to her supervisor. She denies saying the term directly to Singletary, but acknowledges using it to describe Ms. Singletary in her presence. I find the statement was a direct reference to Ms. Singletary and a protest to Ms. Singletary's legitimate interest as an employee and supervisor to report complaints to the Executive Director. The Grievant's conduct by using a racial epithet with respect to a coworker is consistent with the intent and letter of conduct prohibited by the Employer's policy and has been proven to violate the policy establishing a non-discriminatory workplace.

Considering the totality of the record, I find that the Grievant's conduct rose to a sufficient level of severity to support the issuance of a substantial disciplinary penalty but also that several facts and surrounding circumstances mitigate against the penalty of discharge.   The seriousness of the misconduct proven must be weighed against the Grievant's admirable lengthy service to the Employer and any other mitigating factors.

The record reflects that no interim penalty above, First Reminders or written reprimands, had been issued prior to September 13, 2021.  This was despite allegations that the Grievant had engaged in substantially similar conduct in the past without having been disciplined.  Also, there is no record evidence that Ms. Haliburton had been given sufficient notice that conduct of the type exhibited on September 7, 2021 would be considered of such a serious nature that would cause termination despite alleged awareness that this conduct may have existed yet not disciplined.  Put another way, Ms. Haliburton had not been notified, either by a more progressive penalty or warning that her continued employment was conditioned on not engaging in conduct repetitive to what the Employer has alleged.  Moreover, the record clearly reflects that the Employer considered and credited instances of alleged behaviors by Ms. Haliburton which the Union could not challenge in this proceeding nor, in many of the instances, could not be verified by its witnesses.

In this case, I find the reinstatement of the Grievant within a reasonable period of time, coupled with an unpaid suspension, to be wholly consistent with the application of the just cause standard and serve notice that her conduct going forward comply with the

policies prohibited as major violations of conduct in the Employer's policy. This decision may be placed in the Grievant's personal for this purpose.

## **AWARD**

The Employer had just cause to discipline Terri Haliburton but did not have just cause to terminate her. She shall be reinstated within a reasonable period of time. The time between the date of termination and date of reinstatement shall be a suspension without pay and benefits and this Award may be placed in Ms. Haliburton's personnel file to serve as notice of this disciplinary action.

Dated:  January 27, 2023
   West Palm Beach, Florida

_____
James W. Mastriani

State of Florida     }
County of Palm Beach  }

On this 27th day of January, 2023, before me personally appeared James W. Mastriani to me known to be the person who executed the foregoing instrument and acknowledged the same as his free act and deed.

